339 P.2d 727

J. M. FOOTE, as Supervisor of Inspection of Arizona Fruit and Vegetable Standardization Service, Appellant,

v.

Arthur GERBER and Allan Gerber, co-partners, dba Arthur Gerber & Company, Allan Gerber, individually, and Ben Ritter, Appellees.

No. 6450.

Supreme Court of Arizona.

May 27, 1959.

Robert Morrison, Atty. Gen., J. Gordon Cook, Phoenix, for appellant.

Snell & Wilmer, and Don Corbitt, Phoenix, for appellees.

LOCKWOOD, Superior Court Judge.

This appeal is from a judgment which reversed and set aside the order of J. M. Foote, as Supervisor of Inspection of the Arizona Fruit and Vegetable Standardization Service. The Supervisor's order revoked the license of Arthur Gerber and Allan Gerber, co-partners doing business as Arthur Gerber & Company, and required that their license, together with identifica-

tion cards issued to Allan Gerber and Ben Ritter, be returned to the office of the Supervisor.

The matter came before the Superior Court upon a complaint to review the decision of Foote, hereafter called the Supervisor, requesting a trial de novo and seeking to reverse the decision of the Supervisor on the ground that no proper hearing was had with respect to the issue of the revocation of Gerber & Company's license or identification cards. All parties agree this procedure was taken pursuant to A.R. S. § 3-495, and the Administrative Review Act, A.R.S. Title 12, Chapter 7, Article 6.

After filing of all pleadings in the review action including a reporter's transcript of the proceedings had before the Supervisor, Gerber & Company filed a motion for summary judgment. No new additional testimony was presented, but supporting and controverting affidavits were filed, and after extensive oral argument on the motion, and filing of written memoranda, the matter was submitted on the record. The Superior Court thereafter without making findings of fact or conclusions of law entered judgment reversing and setting aside the order of the Supervisor.

The original controversy arose as follows: In the first part of June, 1955, Martori Brothers, Distributors, a partnership, hereafter called Martori, had grown some two-hundred odd acres of cantaloupes, but had no facilities for packing them. Cook

Produce, another partnership, hereafter referred to as Cook, had a shed and facilities for packing, and was packing cantaloupes of its own, under its own labels. One Joe Martori, a member of the Martori partnership, asked Billy Cook, one of the Cook partners, if he would pack Martori's cantaloupes. Cook was willing, but told Joe Martori that Cook had a contract with Gerber whereby Gerber did all the selling for anything Cook packed, and that either Cook or Martori would have to talk to Gerber about selling Martori's cantaloupes if Cook packed them.

According to Joe Martori's testimony, he had a conversation with one of the Gerber partners, Allan Gerber, a few days later, in which Joe Martori told Allan Gerber that Cook was going to pack Martori's cantaloupes, and asked if Gerber would sell them, and Allan Gerber agreed to do so. Billy Cook also testified that he and the Gerbers had discussed the Martori deal, which was that Martori would bring his cantaloupes to Cook's shed, Cook would pack them, and Gerber would sell them. Allan Gerber denied that he ever made any agreement with Martori to sell their cantaloupes, which were to be packed by Cook, though he knew that part of the cantaloupes packed by Cook were Martori's.

 Harvesting, packing and shipping to market commenced in the latter part of June, and continued into July. About the time packing and shipping started, Cook and Martori agreed that for mutual convenience Martori's cantaloupes would be packed and shipped under the Cook label. Cook, through his employees, kept records of the number of Martori's melons as they were delivered at the packing shed, and they were crated separately, but crates containing Martori melons and crates containing Cook melons were loaded together in the same freight cars. Cook kept records of the number of Martori crates and the number of Cook crates loaded in each car, and noted these on the manifests which accompany every freight car to the ultimate purchaser. A copy of each manifest was retained by Cook, but none was directly transmitted to Gerber. Nineteen carloads were sold on the ground, f. o. b. Phoenix, for which Billy Cook collected the proceeds, and paid Martori his share. The sales, of course, were credited to Gerber, under the agreement between Gerber and Cook. Eighty carloads were consigned, and the proceeds were collected by Gerber in Chicago.

About the middle of July Gerber began accounting to Cook for the cantaloupes being sold. Gerber credited Cook's account for the full sale price, less Gerber's commission. Near the middle of August Gerber gave Cook a final accounting. No objection to this method of accounting was made by Cook until about September 14th. About September 1st Cook requested Gerber to advance enough money to pay the

latter's expenses and to pay Martori for his cantaloupes packed by Cook and sold by Gerber.

A difference of opinion arose between Cook and Gerber about the 1st part of September as to the account between them. They met in Gerber's attorneys' office, and for the first time Cook presented to Gerber a statement indicating the amount of Martori cantaloupes packed by Cook under his own label and sold by Gerber. Gerber refused to pay Martori, claiming his agreement was with Cook, not Martori. Cook and Gerber resolved their differences by written agreement, and in such agreement Cook agreed to pay Martori the amount Martori was claiming from Gerber. Thereafter Martori demanded that Gerber pay Martori, and when Gerber refused, filed a complaint with Supervisor Foote. Cook did pay Martori on June 29, 1956.

In the letter of complaint, Martori asked that the Supervisor assist the former to obtain an accounting and settlement from Gerber, and, in the event the amount claimed be not paid forthwith, that Foote authorize Martori to bring suit against Gerber and his surety. Foote thereupon, on October 17, 1955, wrote Gerber, as follows:

"Arthur Gerber & Co.
"1425 S. Racine Ave.,
"Chicago 8, Illinois
"Gentlemen:

"Enclosed is a complaint filed with the Supervisor of Inspection on October 16, 1955, by Martori Bros., Phoenix, Arizona, against Arthur Gerber & Co., Chicago, Ill., a settlement on the part of the defendant for seventy-seven carloads, or part carloads, of cantaloupes consigned by Martori Bros. to Arthur Gerber & Co. during July of the 1955 shipping season.

"This is formal notice that a hearing on the complaint will be held at the office of the Supervisor of Inspection, 2202 West McDowell Road, Phoenix, Arizona, on October 27, 1955, at 10 o'clock A.M., under the terms, conditions, and authority of Sec. 9b of the Arizona Fruit & Vegetable Standardization Act [A.R.S. § 3–488].

"Arthur Gerber & Co., in the person of its officers or agents are herewith directed to be present at the hearing with such witnesses, books, records, etc., as may bear on the transaction named in the complaint."

The hearing was held on the date stated in the notice, both Martori and Gerber being present in person and by counsel. At the conclusion of the hearing, the Supervisor in addition to authorizing Martori to bring suit as requested in his letter, revoked the license of Gerber, and ordered its surrender, together with the identification cards held by Allan Gerber and Ben Ritter.

One assignment of error is made: that the trial court erred in reversing the order

revoking the license for the reason that there was reasonable evidence adduced at the hearing before the Supervisor to indicate that Gerber had failed or refused to make a proper settlement, or pay for farm products received within the time provided by law, or for the reason that there was reasonable evidence at said hearing to indicate that Gerber had not paid Martori the amount received from the sale of its cantaloupes within ten days from being apprised of the exact amount due, in violation of law.

■ Two propositions of law are urged in support of the assignment. The first is that when an administrative officer has the power to hear and determine whether a certain state of facts warrants the application of a certain law, he is acting in a quasi-judicial manner. With this general statement we are in accord. The second is that the quasi-judicial determination of the Supervisor in ordering the revocation of the license and surrender of identification cards was entitled to equal dignity with a judgment of the Superior Court, and therefore on a review by the Superior Court its only function was to ascertain if there was any reasonable evidence in the record of the Supervisor's proceedings which would support his decision.

The position of appellee Gerber is (1) that the Supervisor did not comply with due process of law by failure to notify Gerber prior to the hearing that his license was in jeopardy; (2) that the function of the Superior Court in reviewing an order made by the Supervisor is to examine the facts and the law, and if properly requested, to make findings of fact and conclusions of law as the record requires, and then to affirm, modify or reverse the order; and (3) that in the exercise of its proper functions, the evidence before the court warranted findings that Martori was not Gerber's consignor, and that even if Martori was such consignor, his own conduct prevented Gerber from strict compliance with the law requiring him to account within ten days after receiving the proceeds of the sale of the cantaloupes.

Section 11, c. 101, Laws of 1954 (now A.R.S. § 12–910) defines the scope of review by the Superior Court as follows:

"Scope of review.

"A. An action to review a final administrative decision shall be heard and determined with convenient speed. The hearing and determination shall extend to all questions of law and fact presented by the entire record before the court. No new or additional evidence in support of or in opposition to a finding, order, determination or decision of the administrative agency shall be heard by the court, except in the

event of a trial de novo or in cases where in the discretion of the court justice demands the admission of such evidence.

"B. The trial shall be de novo if trial de novo is demanded in the complaint or answer of a defendant other than the agency and if no hearing was held by the agency or the proceedings before the agency were not stenographically reported so that a transcript might be made. When a trial de novo is available under the provisions of this section, it may be had with a jury upon demand of any party."

It will be noted that the review may be accomplished in three ways: (1) upon the "entire record before the court"; (2) with additional or new evidence in support of or in opposition to a finding, order, determination or decision of the administrative agency, in cases where in the discretion of the court justice demands the admission of such evidence; or (3) upon a trial de novo with or without a jury, if demanded in the complaint or answer of a defendant other than the agency and if no hearing was held by the agency or the proceedings before the agency were not stenographically reported so that a transcript might be made. A.R.S. Section 12–911 provides that the Superior Court shall on

motion of a party before rendition of judgment, make findings of fact and state conclusions of law upon which its judgment is based.

Counsel for appellant Supervisor cites several cases as authority for the proposition that the Supervisor's decision should be given equal dignity with that of a Superior Court decision on an appeal from the latter to this Court. We have examined these cases, and cannot find them applicable.

Upon an examination of the entire record before us, including the reporter's transcript of the evidence adduced at the Supervisor's hearing, we find ample evidence to support a finding by the superior court that not Martori, but Cook was the consignor of the cantaloupes shipped under his label, and further that Gerber could not have complied with the statutory requirement to settle with the consignor within ten days after receiving the proceeds, if it had been Martori, because Gerber had no way of knowing how many cantaloupes under the Cook label were Cook's, and how many were Martori's, until long after such ten-day period had elapsed. If Martori was not the consignor, Gerber owed him no duty to account and there was no ground for revocation of his license. If Martori was the consignor, under the undisputed facts as to packing,

loading and shipping, Gerber, through no fault of his own, could not have settled any account with Martori until many weeks after Gerber received the proceeds, at the time Cook finally informed him how many of Martori's cantaloupes had been loaded by Cook and sold by Gerber, and a revocation of Gerber's license for failure to account within the ten days would be unreasonable, arbitrary, capricious, and void.

In the absence of findings of fact by the trial court, we must presume that its conclusions on every necessary issue were such as would support the judgment. Blackford v. Neaves, 23 Ariz. 501, 205 P. 587; May v. Sexton, 68 Ariz. 358, 206 P. 2d 573; In re Brashear's Estate, 54 Ariz. 430, 96 P.2d 747.

In view of the foregoing, it is unnecessary to determine the question of whether or not due process was observed in the notice from the Supervisor to Gerber.

The judgment of the trial court is affirmed.

PHELPS, C. J., and STRUCKMEYER, UDALL and JOHNSON, JJ., concur.

Charles C. BERNSTEIN, being disqualified, the Honorable Lorna E. LOCKWOOD, Judge of Superior Court, Maricopa County, was called to sit in his stead and participated in the determination of this appeal.